NICHOLLS, J.
The plaintiffs, as father and .mother of the minor, William J. Walker, sue the defendant for damages for having, as they allege, caused his death through their fault and negligence. Defendant answered. After pleading the general denial, it averred that plaintiffs’ son was employed by it in the capacity and for the service of trimming its electric lamps and lowering and elevating same; that his death was through no fault or negligence of itself, but was caused by the fault and negligence of the deceased himself and a co-employé, referred to in the petition as Sherman, who was an assistant of his in the work of trimming lamps, lowering same under his orders; that the deceased and Sherman at the time of the accident were men of experience in the said work, and before taking employment with respondent were expressly warned, notified, and instructed not to undertake the work of lowering or trimming lamps without standing on the insulated stool and using an insulated hook to attach to the cable in lowering and hoisting the lamp, which both parties were provided with, and which they had with them at the time of the visit to the lamp in question, and at the time of the accident; but respondent avers that they neglected and failed to use either the said insulated stool or bench or the hook, although they well knew of its necessity and of the importance of using it to avoid injury; and respondent avers that it was their failure and neglect to use the said insulated instruments which caused the death of the said Wm. J. Walker, Jr., and the injury to the said Sherman, and through no fault of respondent.
In view of the premises, defendant prayed that plaintiffs’ demand be rejected, and their suit dismissed, at their costs, and for all orders and decrees and general relief.
The case was tried before a jury, and a verdict in favor of the plaintiffs for the sum of $3,312 was returned. The court, having overruled plaintiffs’ application for a new trial, •rendered judgment in conformity to the judgment. Defendant appealed.
The evidence shows that plaintiffs’ son and a colored man named Sherman were in the employ of the defendant in the city of Shreveport; their duty being to act together in lowering, trimming, and replacing the electric arc lights which were used by the company in the course of its business.
The system of electric street lighting in Shreveport is an overhead system. The primary wires which convey the current are sustained by upright poles, and the electric arc lights swinging from these poles are suspended from an iron boom at about an elevation of 20 feet above the ground. The booms are stationary. The lamps to be trimmed have to be first lowered. They are then raised to their proper places. To effect this the top of the lamps are attached to an iron rope or cable run on two poles fastened under the boom. The cable or wire rope, after passing over the pulleys, runs down the pole to a point 4 or 5 feet above the ground. At *71 its lower -end this cable has a loop or link, •which is slipped over an iron pin driven into the post. Defendant’s counsel thus describe the process of lowering and replacing the lamps:
“When the employe approaches to lower the lamp, he should have with him an insulated stool, an insulated hook, and a piece of rope. The insulated hook is a small rod, sheathed with rubber, with a hook on the end.. This rod one of the trimmers attaches to the rope when he starts to work. Pie places the stool on the ground, then taking hold of the insulated rod, with the rope attached thereto and hooks it into the loop at the lower end of the cable running down the post which holds the lamp in position. He then releases the cable from the pin where it has been held and as he holds to the rope he allows the lamp to descend by its weight; the rope being held lightly and allowed to slip through his hands. When the lamp is near enough to the ground, the end of the rope is attached to the pole. The stool is then passed to the inspector or trimmer, who stands upon it and throws the switch on the lamp (cutting off any possible current) and then trims the lamp.
“The stool is then passed back to the assistant at the end of the rope, who stands upon it and proceeds to pull down the rope until the end of the cable is reached, when the loop on the end of it is slipped over the pin in the post. Then the rope with the insulated hook piece at the end is detached from the loop in the cable and the work is complete.”
The evidence shows that the act of lowering, trimming, and replacing the lamps is done through two men, who assist each other in the work, and that the appliances above mentioned are furnished the workmen by the company.
Defendant’s counsel claim that, when the workmen make use of these appliances in the manner stated, they are secure from injury at their work, even though the electric fluid may have become dangerous from defective insulation or some other cause.
The evidence shows that Walker and Sherman both knew precisely what was required to he done to insure their safety, and had had experience in the work; that both had received proper instructions, and also proper directions and warnings. In spite of this knowledge, and of these warnihgs and directions, Walker and Sherman had, on several occasions, neglected using the appliances furnished them, and had, in consequence, received electric shocks, though- not sufficient to cause serious injury to either one.
The workmen drove together in a buggy to their different working places, carrying the appliances with them. On the 7th of November, in the course of their work, they reached a lamp swinging from a pole near Louisiana street, or what is called Hamilton Terrace, which they proposed to trim.
The buggy was stopped there, and Sherman jumped from it, taking with him of the appliances furnished him only the rope, and leaving the others with Walker in the buggy. He walked to the post and fastened the rope to the iron cable, which ran down upon it. It happened, unfortunately, that at that time the cable was charged with at least 2,200 volts of electricity. In attaching the rope to the cable, Sherman’s hand touched the end of the wire cable, and he instantly became adhered to — or in popular language — “frozen” to the cable. Walker, seeing Sherman’s situation, immediately jumped from the buggy (leaving, however, the rod and stool behind) and ran to his assistance. Reaching the pole, he caught the cable above Sherman’s hand, and by so doing himself received a shock from the electricity passing through it.
Sherman at once became detached from the wire and fell face downward to the ground, and Walker fell soon after, also with his face downward, upon Sherman’s body. Persons in the vicinity went to their aid, but Walker never recovered consciousr ness. Sherman recovered, and was a witness on the trial.
The defendant company insists that there was no fault in the construction of its line; that the primary lines were insulated, and that there was sufficient distance from the lines to the nearest conductor to prevent the “jumping across” of electricity from them to that *73 conductor, as air was a nonconductor; that the escape of the electricity in this instance must have been occasioned by the sagging of one of'the lines and the burning aw'ay of the insulation upon the wire; ' that of this burning away of the insulation the company was ignorant; that it must have occurred very shortly before the accident, as the indicator at the main office would have communicated the fact to the officers, had this not been the case; that it is a.matter of impossibility for an electric company to prevent the sagging of its lines, and the company had done everything in its power to safeguard its workmen.
The court knows very little of the rules governing electricity, and has to derive its knowledge from the evidence in the record. We are not impressed with the claims so advanced by defendant’s counsel. On the contrary, we think the company could have secured much greater safety in the construction of its lines than it did. If the sagging of the lines was impossible along their whole length, we think it should and could have been guarded against at special “danger points,” and the different posts from which the lamps were swung were points of that kind. We do not think the iron cable, uninsulated, should have run down to the post, to the spike or nail therein to which it was fastened. There was liability to an accident at its lower end. Though such accident might be averted through the proper and constant use of the stool, the insulated rod, and the rope, there was a possibility of danger from forgetfulness or want of skill. The wonder is that some accident to the public had not resulted from these iron cables running down the posts, inviting, as the testimony shows they did, persons to hitch horses to the spikes to which they were fastened;
Defendant’s main contention is that the faulty construction and condition of the lines, if such existed at the time of the accident, was not the proximate cause of the accident; that, granting th'e lines were badly constructed and that they were in bad condition, neither Walker nor Sherman would have been injured, but for 'their own want of care and their failure to utilize the safety appliances which both had been furnished with; that, had they done so, harm would not have resulted to either, even from a bad condition of the lines. Sherman testified as a witness that he was aware, when he' attached, as he did, the rope to the cable, that he exposed himself to danger, but that he took the chances. He also testified that he was, as a workman, under Walker’s orders, and that statement is not contradicted.
No one reading the account of this accident can fail to realize and be impressed with the generous impulse and heroism with which Walker, throwing aside all consideration of himself, strove to save the life of his colored fellow workman. It is one of the many instances where human nature has manifested the divine origin which gave it existence. It would afford the court the greatest gratification to have been the instrumentality through which his courageous and disinterested action should not only be recognized, but made to receive its reward. The court is not, however, permitted- to deal with these matters from the standpoint of either sympathy or admiration. It has to apply the law to the facts of each case presented to it for consideration.
In the brief filed on behalf of the plaintiffs, counsel say in the syllabus:
“The law has so high a regard for human life that it will not impute negligence to an effort to preserve it, unless made under such circumstances as to constitute rashness in the judgment of prudent persons. Efforts to rescue imperiled human life should not be met with condemnation, but should rather receive words of approval, unless regretfully withheld on account of unmistakable evidence of rashness and imprudence.”
The court subscribes to every word of that syllabus. The act of .Mr. Walker certainly *75 does not meet with condemnation from the court. It does receive words of approval; but unfortunately it at the same time finds unmistakable evidence of rashness and imprudence on his part. The only fact that in the least withdraws from his action the character of rashness and imprudence is that on former occasions failure by Sherman and himself to make use of the appliances furnished had not resulted fatally to either of them, and he may have presumed that on this particular occasion death did not lurk in the wire and that Sherman could be saved.
After mature consideration we are obliged regretfully to reach the conclusion that his action in the premises was rash and imprudent, and that by reason of that fact relief to the plaintiffs in this case must be denied.
For the reasons assigned, it is hereby ordered, adjudged, and decreed that the verdict of the jury and the judgment appealed from herein be and they are hereby annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that plaintiffs’ demand be rejected, and their suit be dismissed, with costs.