NICHOLLS, J.
The present action originated in a demand made by Lydia Lewis, widow of Alphonse Maitrejean, on the defendant company for $25,000 for damages suffered by herself individually for the death of her deceased husband. She later filed a similar demand against the defendant company for $25,000 for damages suffered by the children, issue of the marriage between Mai-trejean and herself, for the death of their father.
She was not at the time of the institution of this demand the tutrix of her children, but she brought the suit on their behalf and for their use and benefit as their mother. The allegations of the two petitions were substantially alike. In both petitions it was alleged: That the deceased (husband of plaintiff in one suit and father of the plaintiffs in the other suit) was an apprentice lineman by occupation in the employ of defendant company, and on or about July 19, 1905, the gang with which petitioner’s husband was working was sent to Plum and General Ogden streets, of this city, to repair and strengthen the lines, wires, and poles -of defendant company. That about 10:30 on said day petitioner’s husband and others of said gang were engaged in putting a guy wire on the pole at the corner of the above-named streets on which a crane and electric lamp was hanging. That it was necessary for some one of the gang to climb said pole and fasten the guy wire to its top. That, climbing being the duty of petitioner’s deceased husband, he proceeded to climb the pole and ascended same about 10 feet, when his body 'came in contact with the heel wire of said crane (a wire not dangerous, or supposed to be charged with electricity), from which he received a terrific electric shock from which he was burned and died within an hour.
That the heel wire aforesaid — a wire attached to the lamp aforesaid — passed through the crane and down the pole aforesaid to its foot, which was used to raise and lower the lamp from the ground, at the foot of the pole, was not dangerous, and only became so by its being charged with electric current of high voltage from the power plant of defendant company through the bad, faulty, and imperfect insulation of the uncovered guy wire holding up the outer end of said crane where they crossed a wire of defendant company strung on a cross-arm on said pole used to conduct and charged with electric current as above set forth, the insulat *1059 ing covering of which at said point was worn off, leaving one wire exposed, which contact of the wire aforesaid charged the said guy wire crane and heel wire, and the faulty, bad, and improper construction of the aforesaid crane and the stringing of said guy wires from its outer edge without insulator knobs or circuit breaks to prevent said wire crane and heel wire from being charged with electric current through being crossed with a live wire. That defendant company was at fault and grossly negligent in constructing said crane without insulator knobs or current breakers on its guy wire, and permitting the said crane, its wires, and heel wire to become charged with electric current in the manner aforesaid. That, by reason thereof, she has been damaged in the sum of $25,000.
Defendant excepted to plaintiff’s individual petition; that it was vague, general, and indefinite, and should be amended in sundry particulars before respondent was required to answer thereto; that plaintiff’s petition disclosed no cause of action against this ex-ceptor.
After hearing argument, the court, considering the exceptions not well founded, overruled them. Defendant, under reservation of the exceptions filed, answered plaintiff’s individual petition, pleading, first, their general denial. Further answering, respondent averred that if Alphonse Maitrejean was injured, as alleged in plaintiff’s petition, it was through no fault, negligence, or want of care on the part of respondent, its agents, servants, or employes, but solely through the fault, negligence, and want of care of said Alphonse Maitrejean while performing the work described in plaintiff’s petition; that said Alphonse Maitrejean failed to take the usual and necessary precautions, and to provide himself with the appliances required for safety while engaged in such work, although such appliances were at hand, and are customarily used. It prayed that plaintiff’s demand be denied and rejected, and for judgment in its (respondent’s) favor.
Defendant excepted to plaintiff’s second petition on the ground that it did not disclose any authority of Mrs. Maitrejean to institute suit for and stand in judgment in behalf of her minor children, and that she was without interest to prosecute this case. It prayed that plaintiff’s suit be dismissed. The court, after hearing, sustained this exception as well founded. It ordered, however, that plaintiff qualify as tutrix for her minor children within 30 days after date, and, upon failure so to do, that her suit on behalf of the children stand dismissed as in case of nonsuit.
On October 11, 1906, Mrs. Lydia Maitrejean filed a supplemental and amended petition, stating that she had brought this suit against defendant for the use and benefit of her minor children, issue of her marriage with Alphonse Maitrejean, her deceased husband, to recover the sum of $25,000 damages suffered by them through the negligent killing of their father by the defendant, as set forth in her original petition; that she had since qualified as natural tutrix of her aforesaid minor children to be recognized as such, and made the party plaintiff herein in her official capacity, pursuant to the judgment herein rendered on September 1, 1906.
In view of the premises she prayed for leave to file this supplemental and amended petition; that the defendant herein be cited hereto; that she be recognized in her official capacity as the plaintiff herein; that in due course she have judgment in her official capacity against the defendant for $25,000.
Defendant excepted to the demand contained in the original and supplemental petition, upon the ground that the claim therein asserted was barred by the prescription of one year. In view of the premises, defendant prayed that plaintiff’s suit be dismissed and exceptions maintained. The plea of pre *1061 scription was overruled., and defendant appealed fro-m the ruling. Later, on suggestion of defendant, the demand brought by Mrs. Maitrejean as tutrix of her children was ordered by the court to be consolidated and tried at the same time with the demand made by herself individually.
The defendant answered the demand made by Mrs. Maitrejean as tutrix. It pleaded the general issue. . Further answering, defendant averred that at the time and place described in plaintiff’s petition Alphonse Mai-trejealn was engaged with others in the same employment on a common task, and respondent was not responsible for injuries received through the negligence of said Maitrejean, or of those with whom he was thus and then and there engaged. Mrs. Maitrejean died, pending the suit, and Dausat was confirmed as tutrix of the minors. He was made a plaintiff in the suits.
After trial the court ordered, adjudged, and decreed that plaintiff's, demand in suit No. 77,548 (plaintiff’s individual demand) be rejected, with costs. It was further ordered, adjudged, and decreed that plaintiff’s demand as tutrix in suit No. -79,884 be rejected, with costs.
Plaintiff has appealed.
Alphonse Maitrejean, whose death has given rise to the two demands for damages consolidated in the present action, was killed while in the employ of the defendant company as an apprentice lineman.
At the time of his death he was climbing up the telegraph pole at the corner of Plum and General Ogden streets for the purpose of attaching to that pole (just below the cross-arm upon it) a guy wire, the other end of which was to be attached to a stub pole dug into the ground a short distance from the telephone pole. The object of the guy wire was to steady the latter pole, and hold it firmly in position.
In climbing the pole Maitrejean carried in his naked hand one end of the guy wire which he proposed to attach to the pole, and which was being unrolled upon the ground by a man holding the bundle of wire. It so happened that the iron wire or cable (referred to in the testimony as the heel wire), by means of which the street lamp hanging from a crane on the top of the pole was lowered and raised from its position, was not a dead wire as it should have been, but was then charged with the full force of the electricity passing through the electric wires above it by reason of those wires having come in contact with the heel wire. In ascending the telegraph pole Maitrejean’s hand touched the heel wire, and immediately the whole force of the electric current passed through his body, and killed him.
It is urged on behalf of the defendant company that damages cannot be recovered for an accident happening to the deceased while engaged in performing a task not assigned to him by his master, and which he was under no obligation to do unless ordered by the foreman — a task which under the evidence the foreman would not have assigned to him unless he had been present to supervise his manner of executing the same.
It is further urged that Maitrejean in ascending the pole, carrying in his naked hand the end of the guy wire which was being unrolled upon the ground, was guilty of recklessness and imprudence; that in so doing he was not only guilty of recklessness, but he also failed to make use of the safety appliances which the company supplied to all its employes to guard and protect them in discharge of their duties, which appliances were present at that time for use by the employés at the place where Maitrejean was killed.
For some time prior to the 19th of July, 1905, a number of workmen in the employ of the defendant company under the charge and supervision of a foreman named Blank were engaged in repairing and strengthening the poles and wires of the company in the vicinity *1063 of the streets mentioned. Among these men was Maitrejean. On the morning of the 19th of July Maitrejean had, under the directions of Blank, and under his direct supervision, climbed up a telephone pole near that on which he was killed, and there untied and loosened the electric wires on the cross-arm of that pole; the intention of the foreman being to later on draw them taut, and make them fast after those wires should have been extended over the cross-arm of a new pole which had been dug into the ground near it.
In reference to Maitrejean’s work the following testimony was elicited from Blank as a witness:
“Q. I understand that any work that Maitre-jean did for you, you stood and watched him doing it?
“A. Yes, sir.
“Q. And gave him directions how to do it?
“A. Yes, sir.
, “Q. How was it, then, in the case of the live wires that he had untied that morning in the other poles? Were you there when he was doing it?
“A. I was right there.
“Q. Did you give him instructions?
“A. I explained to him how to untie them and handle, etc.
“Q. Stood there to see him do it?
“A. Yes, sir; until he came off the pole.
“Q. Did he do it right?
“A. Yes, sir.
“Q. Did he get any shock?
“A. No.
“Q. Did he follow your instructions?
“A. Yes, sir.”
Having completed this work, the foreman sent him to attach a cross-arm to a new pole which had been erected. When he had finished this work, he reported back to Blank, the foreman who was then watching the work being done on the pole at the corner of Eagle and Plum streets. Being questioned as to what Maitrejean said to him when he reported back, Blank testified:
“He came to me, and_ asked me what else I had to do for him. I said ‘Nothing right now’; and he looked down the street towards General Ogden street. I had [sent] two linemen [Ketch-am and Hurd] and a helper and the driver of the wagon there to put up a guy about 15 minutes previous. He [Maitrejean] saw Ketcham standing, and he said: ‘Can I go down to Ketcham?’ I said: ‘If you want to.’ The next thing I» heard they were hollering there, and when I came down I seen the man had received a shock and was laying on the ground.
“Q. Did you send him down to Ketcham?
“A. I did not.
“Q. Was there anything for him to do there?
“A. No, sir.
“Q. Who had been sent there to do the work?
“A. A lineman named Hurd and Ketcham, and the helper [Fuller] for him to put up the No. 9 guy. They were sufficient and competent to do the work. Witness did not send Maitre-jean there to do any work.
“Q. Who else was there?
“A. The wagon driver Rudelhaber. He brought the material to him out of the wagon.
“Q. Was a man named Nicol there?
“A. He went too. He was Maitrejean’s helper. When Maitrejean went to Ketcham, £e [Nicol] went too. He followed him down.
“Q. Did you know that Maitrejean was going to do anything down there?
“A. I did not.
“Q. What did you have for Maitrejean where you were?
“A. I didn’t have anything to do for him. I wanted him to stay and wait until we got the guy on and make changes on the pole, and then go on the same pole where he untied the wires first and tie them in after this would be pulled
Testifying as to Maitrejean, Blank said that he was an apprentice lineman; that he (the foreman) generally conducted the work for the apprentice lineman. He saw as to what he thought he could do. He had to learn. He could' not do everything. Where he (the foreman) thinks himself the apprentice is able, he sends him to do the work. When he does not think he is able, he does not send him.
After he (the apprentice) works quite awhile, the foreman puts him with another lineman to work on that pole together, and he would show him more. That is how the apprentice lineman are worked.
Referring to Maitrejean’s act of going up the pole carrying the guy wire in his naked hand, Blank testified: That it was not a safe way of going up a pole. “The safest way is to have a hand line. Get your material you need or whatever you need, tie it to the line, and haul it up the pole. It is easy for him to go on the pole, and he is out of danger. A man carrying anything like iron in his hand laying on the ground, if anything was *1065 around, it would be a dead ground on bim. The effect of a dead ground on an alternating current is enough to kill anybody. The usual way is to go up the pole with a hand line. They (the linemen) do not go up for witness with a wire in their hand when he (the foreman) sends them up. He (witness) always insisted that they go up the pole with a hand line. The linemen all know they cannot carry it with me. They must have a hand line when they work, and there are always hand lines. The helper carries that; and everything they need he gives them. There are always gloves in the wagon; and there were gloves in the wagon on that day, and also hand lines.”
Witness reiterated the statement that he had not “sent” Maitrejean to the pole where he was killed. The latter did not ask him to go and help Ketcham and Hurd. All he was asked “was to go to Ketcham.”
Asked what could have been his purpose in going there, witness answered “to see them doing the work”- — for no other purpose that he knew of. Maitrejean liked Ketcham very much and liked to watch him. He explained things to him when working on the poles. Maitrejean asked witness if he could go down to Ketcham, and he answered, “Yes.” He knew he was going there. Witness knew nothing of the condition of things at the pole when he was killed. It was dangerous at all times to carry up the guy wire on the pole as Maitrejean did. It is dangerous to carry any iron or copper while climbing up the pole. Witness said he had never so far discharged any one for climbing or taking up a guy wire in his hand. If he should run up against a man doing that, he would call him down. If a man should have done it, he would warn him, and, if he did it again, he would discharge him. He had never seen Ketcham do this. If he had seen him, he would have called him down. The linemen knew that, too. Witness would not allow any one to carry a guy wire in his hand. He was particular in that.
At the time Maitrejean was killed Hurd had a hand line on the pole waiting for the wire to go up. Witness supposes he would have gone up with the hand line and pulled it up, as he had one near the pole ready-to put it up. The hand line was lying near the pole. When witness got there after the accident, it was lying at the foot of the pole. Witness did not know that Maitrejean was going to >do any work where he was killed. Had witness been there, he would not have allowed Maitrejean to go up the pole.
Ketcham, one of the linemen who had been sent by the foreman to attach the guy wire to the pole on which Maitrejean was killed, testified that handling a wire on a pole was at all times dangerous, as a person never knows in what position a person might get caught. He testified that those are the instructions of the company all the time when they are working.
Referring to apprentice linemen, witness said:
“He is a man that the company don’t feel safe in sending on everything they want — cannot force him to go. If you are a first-class lineman and the foreman tells you to go on any pole, he expects you to go. If you don’t, he sends you home, but the apprentice might say, ‘I don’t understand that pole,’ or give some reason, and they send some other person — a real lineman. They don’t force the apprentice. That’s what I call an apprentice.”
Witness said that he and Mr. Hurd, linemen, went by the foreman to put up the guy wire. It was the duty of one of the linemen to climb the pole. It was his own part of the duty to pull the guy up. The two linemen sent were Hurd and himself. They were the only linemen there. The foreman sent Nicol to the pole as his helper. There were several men there. He could not say positively who was Hurd’s helper. Fuller was there, and, if he was helping anybody, it was Hurd. Witness did not know that Maitre-jean was at the pole until after the accident. *1067 Witness said the safest way to take a guy wire up the pole would be to pull it up with a hand line. It might take a little more time. He himself oftener than otherwise carried up wire on the pole in the manner that Maitrejean had done, and he had seen it done. He could not swear that the foreman had seen him when doing so, but he could have seen him as he was about the gang at which he was working. Witness had seen other linemen carrying up lines in the same way, and Maitrejean had also seen them.
Asked what the duties of an apprentice lineman were, witness answered:
“His duties are to watch the older linemen how they work as they do, and whenever you can assist them and go up and help them. Generally they put apprentice linemen on a pole with another man to teach him as he starts, and, as he learns, he gets a little braver until he feels that he is safe, and then gets the regular wages. It is his duty to climb poles or do anything he sees he can do. His only .means. of knowledge how to do these things is to see how the others do it, doing it himself, watching them, and doing as he sees others do. 1-Ie is not paid to entirely look on. He is expected to do anything that he feels he can do. He is not supposed to remain on the ground. There was danger in carrying up the wire as Maitrejean took it up, but not generally. Generally you would not consider it dangerous. You expect things to be as they should be. If they are, why, you won’t be hurt.”
This case resembles in some of its features that of Walker v. Shreveport Gas, Electric Light & Power Co., 120 La. 68, 44 South. 925.
In this case,.as in that, the party for whose death damages are sought to be' recovered was killed when working on a telegraph pole by reason of having come in contact with the heel wire, by means of which the lamp suspended from it was raised and lowered, when it was charged (as it should not have been) with electricity. In this case, as in that, this condition of the heel wire was due to the fault of the defendant in having permitted live wires above the heel wire to come in contact with it. In this case, as in that, the person killed failed to make use of safety appliances which had been provided by the company to safeguard its employés from the possible existence of that cause of danger. In the Walker Case the person killed was one of those engaged by the company to trim the lamp, and for that purpose to raise and lower it. -In this case the person killed was an apprentice lineman, who, with the object of fastening a guy wire just below the cross-arm upon the pole, was climbing the pole, carrying in his naked hand one end of the wire, while the wire was being dragged on the ground and unrolled by a person below. The duty of attaching this wire to the pole and making it fast below to a stub post at some little distance from the pole was assigned by the foreman of the company to two experienced linemen (Hurd and Ketcham) with men upon the ground below as assistants to them. The person killed was not directed to report for duty to either of those men, and neither one nor the other was authorized or warranted in substituting the apprentice linemen for themselves in the discharge of the duty with which they had themselves been specially intrusted. As they could not substitute him for themselves as a duty on his part, still less could they transfer the execution of the work to him as a privilege. It cannot be claimed under the evidence adduced that at the time of the injury he received Maitrejean was in the discharge of the duties he was employed for. An apprentice lineman occupies relations of a special character in respect to the company which employs him, just as the company occupies a special position touching its rights and obligations to the apprentice. The company recognizes that the apprentice is under its tutelage and entitled to its special protection, and is not justified and warranted in placing him by its orders in places of danger.
On the other hand, the apprentice is not at liberty to select for himself the particular *1069 work he is to do, nor the time, place, and manner of executing it. He can only do this under the orders and direction of the employer. If he does otherwise, he does so on his own responsibility and at his own risk.
It is not for him to determine whether work of a particular kind is dangerous or subject to possible risks and to act on his own judgment. While the climbing of poles and the handling of wires may be within the scope of an apprentice lineman’s employment, he is not in the discharge of his duties as an employé when he undertakes to do work of that kind which he has not been directed to do. The carrying up by Maitrejean of the end of the guy wire in his naked hand under the circumstances that this was done was an exceedingly dangerous act, as events proved. True, it might not be dangerous to do this when conditions are all right; but, as testified to, it is dangerous at all times to climb up a post under overhanging electric wires with a wire in the naked hand. Such danger very frequently is the fault of the electric company, but not necessarily so. It is sometimes due to contingencies not possible to anticipate. The company in the use of safety appliances is seeking to guard its workmen, not only from existing, but from possible, dangers. It has the right to require of its employes that, they make use of the appliances furnished to guard themselves from injury.
We do not think under the circumstances disclosed by the evidence defendant is responsible for the accident in the premises. This conclusion does away with the necessity of a decision upon the ruling of the district court on the subject of the prescription of one year pleaded by defendant, and appealed from by the latter.
For the reasons assigned, the judgments of the district court appealed from are hereby affirmed, with costs.